EXHIBIT A



POINTERS, CLEANERS &
CAULKERS

AGREEMENT

between

LOCAL UNION NO. 1,
NEW YORK

of

THE INTERNATIONAL UNION

of

BRICKLAYERS AND ALLIED
CRAFTSMEN

and

BUILDING RESTORATION CON-
TRACTORS ASSOCIATION, INC.

Effective on and after July 1, 1997 to
June 30, 2000

RECEIVED MAY 1 2 1998

This Collective Bargaining Agreement (the "Agreement") is made as of the 1st day of July 19947, by and between the undersigned Company (the "Company" and/or the "Employer", and Local 1, New York, INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTSMEN AFL-CIO, an unincorporated association having its principal headquarters at 4 Court Square, Long Island City, New York 11101 (the "Union").

## WITNESSETH:

WHEREAS, the Company is a contractor engaged in the industry of painting, cleaning, caulking, repairing, cutting, patching, waterproofing, reconstructing, removing and restoring the exteriors and/or interiors of buildings and masonry structures; and

WHEREAS, the Union is an organization which, in part, is composed of and represents the workers in this industry; and

WHEREAS, the parties hereto desire to cooperate in establishing conditions of labor and safety, to provide methods for the fair and peaceful adjustment of all disputes which may arise in the industry, to provide that employment hereunder shall be in accordance with conditions and at wages and fringe benefits herein agreed upon, and by reason of this Agreement and the purposes and intent thereof, to bring about stable conditions and uninterrupted operation in the industry, consistent with fair wages and fringe benefits and proper working conditions as provided for hereunder; and

WHEREAS, the parties hereto believe in and support the principle of equal opportunity, for

-1-

## INDEX

| ARTICLE I | Representation | 2 |
|---|---|---|
| ARTICLE II | Objects | 2 |
| ARTICLE III | Equal Opportunity | 2 |
| ARTICLE IV | Scope of Work | 3 |
| ARTICLE V | Geographical Jurisdiction | 4 |
| ARTICLE VI | Union Recognition | 4 |
| ARTICLE VII | Union Security | 5 |
| ARTICLE VIII | Job Referral System | 7 |
| ARTICLE IX | Hiring and Work Conditions | 8 |
| ARTICLE X | Safety | 10 |
| ARTICLE XI | Foreman, Job Stewards & Union Representatives | 14 |
| ARTICLE XII | Hours, Holidays & Overtime | 18 |
| ARTICLE XIII | Wages | 21 |
| ARTICLE XIV | Check-Off & Political Action Committee | 30 |
| ARTICLE XV | Fringe Benefits Funds | 31 |
| ARTICLE XVI | Industry Promotion Fund | 41 |
| ARTICLE XVII | Bonding | 43 |
| ARTICLE XIII | Apprentices | 44 |
| ARTICLE XX | Insurance | 46 |
| ARTICLE XX | Other Contracts | 47 |
| ARTICLE XXI | Arbitration | 52 |
| ARTICLE XXII | Trade & Jurisdicional Disputes | 54 |
| ARTICLE XXIII | No Strikes & No Lockouts | 54 |
| ARTICLE XXIV | Continuity of Agreement | 56 |
| ARTICLE XXV | Validity | 57 |
| ARTICLE XXVI | Miscellaneous | 59 |
| ARTICLE XXVII | Duration | 59 |
| ARTICLE XXVIII | Retroactivity | 59 |
| ARTICLE XXIX | Renewal | 59 |
| ARTICLE XXX | Complete Agreement | 60 |
| ARTICLE XXXI | Benefit | 61 |
| ARTICLE XXXII | Effectuating Clause | 62 |
| ARTICLE XXXIII | Signature | 62 |



and in employment, for all qualified persons without discrimination because of race, creed, color, gender, national origin, age or Union membership.

NOW, THEREFORE, the parties hereto hereby agree as follows:

## ARTICLE I
## REPRESENTATION

The Employer obligates itself to live up to in good faith to all the provisions of this Agreement, and the Union and its members obligate themselves in good faith, that it will live up to the provisions of this Agreement, it being agreed and understood that the Union contracts on behalf of itself and on behalf of all its present and future members now or hereafter employed by the Employer.

## ARTICLE II
## OBJECTS

This Agreement is entered into to establish and maintain wages, fringe benefits, hours and working conditions for the work on building construction covered by this Agreement in the territory to which it applies, to prevent strikes and lockouts, to insure the peaceable adjustment and settlement of any and all grievances, disputes or differences that may arise between the parties as such or between them as Employer and Employee, and to provide for the adjustment of disputes between trades.

## ARTICLE III
## EQUAL OPPORTUNITY

The Employer and the Union mutually agree

-2-

that each will comply and cooperate with all federal, state, and/or local laws, codes, rules, ordinances, regulations, executive orders and administrative decisions dealing with non-discrimination in the recruitment, hiring, rate and manner of compensation, training and apprenticeship, employment and retention in employment, job tenure, transfer, promotion, upgrading, demotion, downgrading, lay-off, termination and discharge, and every other matter covered by such laws, codes, etc., not herein expressly mentioned. The Employer and the Union shall not discriminate against any Employee or applicant for employment because of race, creed, color, gender, national origin, age or Union membership.

## ARTICLE IV
## SCOPE OF WORK

Section 1. The work covered by this Agreement shall, without limitation, be work done on the exteriors and/or interiors of buildings and masonry structures, using all equipment to complete the task including the following: pointing, cleaning, caulking, repairing, cutting, patching, reinstalling of replacement materials, waterproofing, reconstructing, renovating and restoration of masonry, using rigging, steam jennys and air compressor, and related power tools and hand tools, power operated wall wheel or equivalent, swing scaffolds and scaffolding, the rigging or assembling of suspension systems, the use of welding and cutting equipment for incidental welding and cutting.

Section 2. If a mold is made on site by Local No. 1 members, then all casting done with that mold shall be made by Local No. 1 members on or off the job site.

-3-



## ARTICLE V
### GEOGRAPHICAL JURISDICTION

Section 1. This Agreement shall cover all work described in Article IV above and Article VI below when performed within territorial jurisdiction of the Union which is as follows: within any of the five (5) counties of the City of New York, or within the counties of Nassau and Suffolk on Long Island, State of New York.

Section 2. When an Employer performs any work outside of established boundaries of New York City and Long Island, the Employer shall abide by the terms and conditions of the applicable Agreement in that area to which a subordinate Union of the International Union of Bricklayers and Allied Craftsmen (the "International Union") is a party. If no Agreement exists, the Employer shall abide by the applicable terms and conditions established between the Employer and a Union established between the Employer and a Union affiliate of the International Union in that area. The foregoing shall apply, however, to such agreements and practices which do not violate the National Labor Relations Act, as amended.

## ARTICLE VI
### UNION RECOGNITION

Section 1. Insamuch as the Union has submitted proof and the Employer is satisfied that the Union represents a majority of its Employees in its bargaining unit described herein, the Employer recognizes the Union, pursuant to Section 9(a) of the National Labor Relations Act, as the exclusive collective bargaining agent for all Employees within that bargaining unit, on all present and

-4-

future jobsites within the jurisdiction of the Union, unless and until such time as the Union loses its status as the Employees exclusive representative as a result of an NLRB election requested by the Employees. The Employer agrees that it will not request an NLRB election.

Section 2. The Employer agrees to recognize the present and future jurisdiction claims of the Union that have been established in its Constitution, by agreements with other crafts, or as the result of decisions under the New York Plan for the Settlement of Jurisdiction Disputes in the Construction Industry or under the National Plan for the Settlement of jurisdictional disputes in the construction industry, or according to past and prevailing practices, and further agrees to assign all such work to members of the Union before commencing work, subject to the foregoing.

## ARTICLE VII
### UNION SECURITY

Section 1. All Employees who are members of the Union at the time of the signing of this Agreement shall continue membership in the Union. All other Employees covered by this Agreement who work on a scaffold or on the job site must be represented by the Union after the eighth (8th) day following the beginning of employment or the date of this Agreement, whichever is later, and must remain in good standing in the Union as a condition of continued employment. The Employer shall give notice to the Union of the hiring of any Employees covered by this Agreement who are not members of the Union. The Union has the sole right to determine

-5-



qualifications for membership in the Union. If the provisions for Union security clauses are modified by Congress during the term of this Agreement, this clause will be automatically modified to conform to such changes.

Section 2. Maintenance of Union membership and Union representation shall be evidenced by the current Union Book with picture sealed in it, working card, or correct permit card, which shall indicate that current dues have been paid to the Union. The Union Book signifies that the Employee, Journeyman or Apprentice, has been qualified for membership by the Union, under Article XXVI, Section 6 of this Agreement.

Section 3. No persons representing the Union, except its Business Manager, Business Agent, Organizer, or other official Union business representatives shall have the right to interview Employees during business hours. Such Union representatives shall comply with all general conditions of the job regarding passes, entrance to be used, etc.

Section 4. Employees covered by this Agreement shall not refuse to work with Employees who after eight (8) days employment, have complied with the Union security provisions of this Agreement. However, Employees covered by this Agreement are not required to work with Employees who do not comply with the Union security provisions of this Agreement. It is understood that additional Employees secured by the Employer shall comply with the requirements set forth herein.

Section 5. No Employee shall work for any Employer or person who is not a signatory to an agreement with the Union and does not comply with the terms and conditions of employment in said agreement.

Section 6. In the event that any applicable statute is enacted or any decision rendered by a court or administrative agency having jurisdiction thereof, which statute or decision permits union security or hiring provisions more favorable to the Union than those contained herein, then the parties hereto shall meet and amend this Agreement so as to give the Union the maximum benefits permitted by such statute or decision.

## ARTICLE VIII
## JOB REFERRAL SYSTEM

In the referral by the Union of its members for employment by the Employer as provided for in Article IX of this Agreement, the following provisions shall govern:

Section 1. The Union shall establish and maintain an open employment list for the employment of competent Employees entitled "Non-Exclusive Hiring List of Journeymen and Apprentices". All unemployed Journeymen and Apprentices shall register at the Union office for inclusion on the employment list. This list will be mailed to the Employer on a weekly basis, unless the Employer is delinquent in the payment of Fringe Benefit Contributions or is in violation of this Agreement.

Section 2. Employees referred through the

Journeymen or Apprentice members of the Union by the Union shall be the last to be let go when there is a "lay-off" or "cut-back" in the work force.

Section 3. When Employees are referred to a job upon request of the Employer and report for work and no work is provided, they shall receive four (4) hours pay, except when due to inclement weather, or when due to the fact that said Employee's work partner has failed to report to work, and no other work is available.

Section 4. Inclement weather shall be determined at the job site at the start of that shift. The foreman shall make the determination. Said determination shall be approved by the Employer's office if required by said Employer. If the Employer's office decision conflicts with the Foreman, the Job Steward shall submit a printed list of names to the Union of the men who showed up for work. This list should be counter-signed by the Foreman. If the Union disagrees with the decision, it may file a grievance with the Joint Industry Board.

Section 5. All Employees who start to work but are prevented from continuing to work for any reason, except inclement weather, shall receive pay for the full work day. The Employer may assign said Employee to another job site if work is available.

Section 6. Employees shall be engaged at the Union office, at the shop, or at the job. If engaged at the Union office or at the shop; they shall be paid from the time they report for work. If engaged at the job, they shall be paid from the time they are so engaged.

-9-



Union must have the necessary skill and experience to perform the job. All Journeymen and Apprentices who have entered the Union after July 1, 1990 and are referred by the Union for employment shall have successfully completed the full apprenticeship program, or have passed a competency test given by a Testing Board established by the Union.

Section 3. The Employer shall retain the right to reject any Employee referred by the Union. In the event of such rejection, the Union shall notify the Union. The Union shall then refer other Employees to the Employer until the required number of applicants are obtained.

Section 4. The Employer shall notify the Union when an Employee is hired from the employment list or any other source.

ARTICLE IX
HIRING AND WORK CONDITIONS

Section 1. When the Employer, in compliance with this Agreement, requests the Union to send Employees to a job, the Union shall cooperate by sending only such as are experienced in the type of work being done on the said job by that Employer.

Section 2. The Employer shall be at liberty to employ and discharge whomsoever it sees fit, and all Employees represented by the Union shall be at liberty to work for whomsoever they shall see fit in accordance with the terms of this Agreement. The Employees who have been qualified as

-8-

**Section 7.** On steam cleaning jobs, only one (1) steam hose shall be used on a scaffold, and such steam hose shall have only one (1) nozzle.

**Section 8. Hand Tools:** Each mechanic shall be responsible for having the following tools: lump, hammer, hawk, mixing trowel, patching trowel, four (4) jointers - 1/4" through 1", four (4) stickers - 1/2" through 1", adjustable wrench and pliers.

**Section 9.** The Employer shall arrange, wherever possible, for the use by Employees, of suitable sanitary conveniences and of suitable lockers or places for the safekeeping of their clothing and tools.

**Section 10.** For all new hires, every fourth (4th) mechanic shall be referred by the Union.

## ARTICLE X
## SAFETY

**Section 1.** A Joint Safety Committee shall be established and meet not less than twice (2) a year.

**Section 2.** Occupational Safety and Health Administration (OSHA) rules for suspended scaffolding, frame scaffolding, system scaffolding, tube and clamp scaffolding and rolling scaffolding shall be incorporated into this Agreement and be part of the "working rules", as the basic Safety Standards for working Conditions.

Additional Safety Standards shall be added by the Joint Safety Committee and be incorpo-

-10-

rated into this Agreement.

This Section shall be left open to changes agreed to by the Joint Safety Committee. These changes shall then be incorporated into this Agreement without the need of reconvening the Negotiations Committees from the Employers and the Union. Any decision reached and agreed to by the Joint Safety Committee shall be incorporated into this Agreement and be binding to all signatories of this Agreement.

It will be the responsibility of the Union to inform the Employers (including Independent Contractors) and its members of such changes.

**Section 3.** The Joint Safety Committee shall establish and implement a Drug Testing Program.

**Section 4.** On all jobs on buildings over ninety (90) feet in height, wherein only two (2) Employees are employed, extra help must be furnished to rig the jobs, when requested by the Foreman.

**Section 5.** Any Employee working on a job in a Boatswain's chair must have a mechanic or an apprentice as an attendant.

**Section 6.** Two (2) Employees shall work on each scaffold.

**Section 7.** If required, additional safety rules for handling storage, application and disposal of chemical compounds such as epoxies, stone consolidants, coatings, etc., shall be addressed by the Joint Safety Committee and be incorporated into this Agreement.

-11-

Section 8. When the Employer fails to supply the proper equipment on the job site the proper equipment and safety equipment, as set forth under the Occupational Safety and Health Administration and Joint Safety Committee; rules, penalty time will be paid. Employees will be paid at that shift's rate of pay during the regular shift hours until the proper equipment is supplied. Said pay shall not exceed one (1) day's pay unless the employee is sent back to the job site and the proper safety equipment is still not there. The onset of inclement weather shall not affect the employees waiting time for that day. The safety equipment shall included, but not be limited to the proper equipment (rigging, clamps, tiebacks, etc.) to make the job site safe. All containers of hazardous materials shall be properly labeled in accordance with OSHA requirements.

-12-

Section 9. The use of safety equipment furnished by the Employer is mandatory. The Business Manager of the Union shall call the attention of the Employer to any condition which upon inspection he considers is endangering the safety of Employees represented by the Union. If the Employer does not remedy the condition, either through negligence, disagreement as to the presence of danger, or question of responsibility under his contract, the Business Manager may refer the matter to the New York State Department of Labor, the Occupational Safety Health Administration, and any other federal, state or local agency with jurisdiction thereof, with a request for an immediate inspection. The Employer shall comply with the regulations and rules of the Labor Department of the State of New York, of the Building Department of the City of New York, of

the Occupational Safety & Health Administration, and of all other federal and state governmental bodies.

-13-



## ARTICLE XI
## FOREMAN, JOB STEWARDS
## AND UNION REPRESENTATIVES

**Section 1.** The Foreman's rate shall be as follows:

(a) On every job wherein one (1) to five (5) Employees are employed, one (1) of them shall be the Foreman and shall receive one dollar and twenty-five cents ($1.25) per hour extra wages above the mechanic's scale of wages; and

(b) On every job wherein six (6) or more Employees are employed, the Foreman shall receive two dollars ($2.00) per hour extra wages above the mechanic's scale of wages.

**Section 2.** On every job wherein seven (7) or more Employees are employed, the Foreman shall act in a supervisory capacity only, shall not use the tools of the trade but shall have general responsibility for all aspects of the work, and shall continue in such capacity until the end of the job, except that if the number of Employees on the job becomes less than seven (7), the Foreman shall return to his mechanic's work on the job, as set forth in Section I hereinabove.

**Section 3.** The Foreman shall be the agent of the Employer and a dues paying member in good standing of the BAC Local 1 on all jobs where more than half of the work is the work of this trade. He shall not be tried for any of his acts as a trade. He shall not be tried for any of his acts as a Foreman without due notice of a trial accompanied by a written statement of the charges against him being given to the Employer.

-14-

**Section 4.** The Foreman shall be the last Employee discharged from the job.

**Section 5.** To effect the observance of this Agreement, each job shall have a Job Steward as follows:

(a) On all jobs there shall be one (1) Job Steward appointed by the Business Manager of the Union. The Job Steward shall be a working Employee. The Employer shall recognize and deal with the Job Steward as the representative of the Union, who shall attend to the interests of the Union. The Job Steward shall be permitted the time needed to perform such duties. At other times, he shall perform the work assigned to him. With the exception of the Foreman, the Job Steward shall be the last Employee discharged by the Employer from that particular job. The Job Steward may not be transferred to another job location without consent of the Union. A Job Steward shall not be considered a Job Steward until he has reported to the Union, the location of the job and the status of the Employees working on the job.

(b) The Job Steward shall determine that all Employees on the job are employed in accordance with this Agreement. He shall see that the with this Agreement as defined herein is observed classification of trade as defined herein is observed and that all terms of this Agreement are complied with. The Job Steward shall be permitted the time needed to perform such duties. At other times, he shall perform work assigned to him. He shall perform his duties as Job Steward with the least inconvenience to his Employer as possible. The Job Steward shall report the total amount of hours worked on his job to the Shop Steward for Union

-15-

members. The information is to be furnished by the Employer's representative (Foreman).

(c) In the event of any injury by accident to an Employee, causing loss of time, the Job Steward shall immediately cease work, and investigate the cause of the accident, gather all evidence, such as would be useful to establish any claim of the injured member or beneficiary thereof and take all action necessary to prevent a reoccurrence.

(d) No Job Steward, Shop Steward or Employee shall be discharged for inquiring as to the Union cards of Employees working on any job.

(e) The Job Steward shall be offered any over-time first after the Foreman.

(f) All Employees shall be employed in accordance with this Agreement. If the Job Steward is discharged for calling the attention of the Foreman to any violations of the Agreement, he shall be at once reinstated until the matter is resolved. All complaints arising between the parties involving the discharge of a Job Steward shall be resolved through the grievance procedure set forth herein. If such discharge is determined to have been unjustified, the Job Steward shall be paid for all lost time.

Section 6. No person representing the Union except its business representatives shall have the right to interview the Employees during business hours. The business representatives shall comply with all general conditions of the job regarding

passes, entrances to be used, etc.

Section 7. The Shop Steward shall be appointed at the discretion of the Business Manager by the Business Manager from among any Journeymen members of the Union, regardless of whether such Journeymen member is an Employee of the Employer. The Shop Steward shall be the Union's representative for that shop and shall report directly to the Business Manager all job locations, hirings, firings and layoffs. The Shop Steward shall keep a current list of all members of the Union employed by the Employer with information supplied by the Employer upon request by the Shop Steward. The Shop Steward shall make reports to the Business Manager at the monthly Shop Steward meetings. The Employer shall offer any overtime work on any other job first to the Shop Steward, if additional Employees, beyond those on the overtime job are required.

Section 8. A Shop Steward shall not be discharged by an Employer who was a member July 1, 1990, if the Employer has in it employ more than ten percent (10%) of the number of Employees it had in its employ on the prior July 1st or six (6) employees, whichever is less. If the number of employees on July 1st is ten (10) or less, then the Shop Steward shall be next to last discharged. A Shop Steward or Job Steward may be discharged for cause only except as hereinabove. There shall be no discrimination by the Employer against any Employee because of his duties as Shop Steward or Job Steward. The Shop Steward shall be the last Employee discharged by the Employer and shall be the first offered employment.



Section 9. Each Employer shall furnish the Union with a list of Employees who are authorized to hire and fire bargaining unit Employees. The Union shall furnish the Employer on a periodic basis the names of all Union members and Apprentices in good standing.

Section 10. When a Local No. 1 person is hired the Employer shall advise the Union within twenty-four (24) hours.

Section 11. The Employer shall supply a list of job sites by telephone, fax or mail to the Union on a weekly basis. Failure to furnish said list shall result in a grievance to be referred to the Joint Industry Board.

## ARTICLE XII
## HOURS, HOLIDAYS AND OVERTIME

Section 1. The regular hours of work shall consist of any eight (8) consecutive hours per day, paid at straight time, Monday to Friday, inclusive, exclusive of lunch which shall be one-half (1/2) hour in duration from twelve (12) noon to Twelve-thirty (12:30) p.m. The start time shall be between six (6) o'clock a.m. and nine (9) o'clock a.m., Monday through Friday, inclusive. The Employee shall leave his work station fifteen (15) minutes before the end of his work day for cleanup.

Section 2. All Employees shall be entitled to one (1) paid break period during the first half of each work day, and one (1) paid break period during the second half of each work day.

Section 3. No work shall be performed on

-18-

Saturday, Sundays, or Holidays, except and unless prior oral notice is given by the Employer to the Shop Steward, Business Manager, Business Agent or any other business representative specified by the Union, on the previous day, stating the shop or building where work is to be performed and the number of Employees required. Failure to notify the Union in advance of weekend and holiday work shall result in a grievance to be referred to the Joint Industry Board.

Section 4. Make-up time.

(a) Where time is lost due to circumstances beyond the control of the Employer, there shall be a ninth (9th) hour of make-up time during the week days at straight-time rates, but only up to a maximum of forty (40) hours per week. Any work over forty (40) hours shall be paid at the overtime rate. The Employee shall be entitled to a full day's work on Saturday and hours above the forty (40) hours for that week shall be at the overtime rate.

(b) The Employer shall be entitled to Saturday as a make-up day throughout the year. Hours lost during the week due to circumstances beyond the control of the Employer shall be aggregated and the number of hours, up to a maximum of forty (40) hours per week, may be worked on Saturday at straight time rates.

(c) No Employee shall be required to work on Saturday or the ninth (9th) hour during weekdays, and no Employee shall be subject to discipline, retaliation of any kind or penalty for failure to do so.

-19-



N49768

Section 5. The Holidays referred to herein are New Year's Day, Martin Luther King Jr. Day, President's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day. If any Employees on a job by job basis choose to work on Martin Luther King Jr. Day, and/or President's Day they may do so at the straight time rate of pay. If a Holiday is on a Tuesday or a Thursday, then Employees on any job shall have the option, on a job by job basis, not to work or to work on Monday if Tuesday is a Holiday and not to work or to work on Friday if Thursday is a Holiday.

Section 6. Beginning January 1, 1972, a Federal Law, signed in September, 1968, and also approved by the New York State Legislature on April 22, 1969, created a change of date on Memorial day - the last Monday in May. When permission is granted to work on Memorial Day, time and one-half shall be paid. In all cases, the Holidays referred to in this Agreement will be observed on the day and date established by the State of New York.

Section 7. All work outside of regular work hours shall be done at time and one-half.

Section 8. Time and one-half shall be paid for all work performed on Saturdays and Sundays regardless of the number of hours worked in the week, except as otherwise provided herein, and on the Holidays described in this article.

Section 9. Time and one-half shall be paid for all work starting or done in the morning before and up to eight (8:00) a.m., unless the start time is

-20-

set at six (6:00) a.m., in which case time and one-half shall be paid for all work starting or done in the morning before and up to six (6:00) a.m.

Section 10. Time and one-half shall be paid for all night work which is work starting at or after four (4:00) p.m. or done between the hours of four (4:00) p.m. and seven (7:00) a.m., but any night work in excess of eight (8) hours shall be payable at the rate of time and one-half.

Section 11. Any employer choosing to operate on a seven (7) hour day must pay the full eight (8) hour pay.

## ARTICLE XIII
## WAGES

Section 1. Employer agrees that it will hire all Employees performing work covered under this Agreement for the wages, fringe benefits and hours, not less than those specified herein.

Section 2. Wages shall be paid weekly on the job during working hours not later than three-thirty (3:30) p.m., said wages to be paid either in cash in envelopes, upon the outside of the envelope or on a slip in the envelope which shall be plainly marked to indicate the Employer's name, the Employee's name and number, the Social Security Number, the hours worked, the week ending date, all itemized deductions, and the amount of money enclosed, or by check provided:

(a) The Employees in a particular shop agree to be paid by check; and

-21-

check, such notice to include the proposed check-cashing arrangements, if required. If such arrangements are not satisfactory they shall not be put into effect until resolved pursuant to the grievance procedure set forth herein. In the event of lack of agreement, either party may request arbitration.

(b) The check contains the above information as marked on the face of the pay envelope or on a slip inserted therein; and

(c) The Employer has complied with the provisions of this Agreement relating to bonding; and

(d) Any deductions from wages now or hereafter required by law shall also be marked on the face of pay envelope or on a slip inserted therein. This also includes deductions of taxes for all contributions credited to the Employee's Benefit Fund and dues check-off as required by law, and

(e) Written notice by certified mail shall be given to the Union of an election to pay by check; and

(f) In the event a wage check is not honored by the bank on which drawn for any reason whatsoever, excluding bank error, than it shall be as if the Employee did not get paid at all and the penalty provisions of this Agreement for non-payment of wages shall apply; and

(g) Wages may be paid by cash or check. Employers paying by check from an account with a bank located outside the Union's geographical jurisdiction shall provide reasonable check-cashing facilities permitting the Employees to cash the check free of charge and without any loss of working time. An Employer not now paying wages completely by check shall give notice in writing to the Union at least two (2) weeks prior to the commencement of payment by

-22-

Section 3. The Employer shall designate the day on which the work week shall end. Wages shall be paid no later than three (3) days after the close of the work week. No Employer shall pay wages on Friday with the exception of those Employers who currently have Friday as their regular pay day, provided that if wages are paid by an Employer on Friday, such wages shall be tendered in cash. Friday be a bank holiday, wages shall be due and, payable during working hours on Thursday for work done at least through quitting time of the preceding Monday. In no event shall there be a delay in the payment of wages exceeding one (1) day. If the delay of the payment of wages is on a Friday, payment must be made by twelve (12:00) Noon. Should an Employee be required to wait for his pay after the hours specified in Article XII, except where the wait is caused by factors beyond the Employer's control, then in addition, the Employee shall receive double-time for the first two (2) hours of waiting on pay-day or layoff, and single-time for any additional waiting time. However, such waiting time shall not exceed twenty-eight (28) hours. Any Employee wishing to make claim for waiting time shall be required to show proof that he was actually present on the job during the waiting time claimed, except Saturdays, Sundays and Holidays when the Employee need not be present on the job to make a claim.

-23-



-20- Section 4. Employees shall be given one (1) hour's notice before being discharged or laid off, and in either event they shall be fully paid at once in cash or by insured check, under the conditions set forth in Sections two (2) and three (3) above. This does not apply to any temporary suspension of work during any pay week for reasons beyond the control of the Employer.

Section 5. Employees shall pay their own traveling expenses when employed on a job within the City of New York. If, however, a job is located in a distant section of the City of New York, and to travel by railroad would be more practicable, e.g., Far Rockaway, then the Employer shall pay the traveling expense.

Section 6. On a job outside the City of New York, but within commuting distance, Employees shall provide transportation for themselves which will assure their arrival at the job site at the regular starting time. Employees are to remain at said jobsite until the regular quitting time. The Employee working outside the City of New York, shall be reimbursed for travel time at $20.00 per day minimum. In addition, the Employee shall receive reimbursement for tolls incurred which shall be verified by receipts.

Section 7. When Employees are employed on a job which necessitates their living outside the City of New York, they shall receive, over an above their wage, a minimum of two-hundred fifty dollars ($250.00) per week additional compensation. They shall also be paid all transportation expenses to and from the City of New York, and the regular rate of wages for the time spent in going

to and returning from the out-of-town job.

Section 8. Employees ordered from one (1) job to another during the regular working hours, shall be paid all transportation and telephone expenses and any other expenses, incidental thereto.

Section 9. On a job in a locality outside the City of New York, the rate of wages (but not fringe benefit contributions) to be paid shall be those set forth herein or the rate of wages prevailing in the said locality, whichever rate is higher.

Section 10. Employees, when laid off, shall receive the full amount of wages due them.

Section 11. If there is a composite crew doing the same work in the same area under the jurisdiction of Local No. 1, than the Local No. 1 members shall be paid at the highest wage rate within that composite crew.

Section 12. Wage rates and fringe benefit contributions for Employees within the bargaining unit shall be:

EFFECTIVE JULY 1, 1997 TO JUNE 30, 2000

HOURLY WAGES: *
MECHANIC.....................................$25.80
(Dues Check-Off, Defense Fund, BAC PAC Included)

FOREMAN - 1 to 5 Men..................$27.05
(Dues Check-Off & Defense Fund Included)



FOREMAN - 6 Men or More.............$27.80
(Dues Check-Off & Defense Fund Included)

BOARD MONEY ..........................$250.00
Per Week Minimum

TRAVELING MONEY ...................$20.00
Per Day Plus Tolls

### FOR CLEANING ONLY OUTSIDE REGULAR WORK HOURS

1st SHIFT RECEIVES $ .25 PER HOUR DIFFERENTIAL

2nd SHIFT RECEIVES $ .50 PER HOUR DIFFERENTIAL

This provision shall only apply to jobs listed by the Employer to the Union on or before July 31, 1997 for jobs under Contract prior to April 1, 1997.

### MECHANIC HOURLY FRINGES:

INSURANCE AND WELFARE FUND....$ 5.75

PENSION FUND............................$ 3.50

ANNUITY FUND .......$2.00 (effective 11/1/94. Prior thereto, $2.25)

BAC LOCAL #1 DEFENSE FUND.....$ .10 (DEFENSE FUND is deducted from above wages after taxes)

PROMOTION FUND ......................$ .10

DUES CHECK-OFF.........................$ .83
(Check-Off is deducted from above wages after taxes) ($38 International; $45 Local No. 1)

INTERNATIONAL PENSION FUND......$ .25

MECHANICS BASE HOURLY RATE....$37.70

NEW YORK LOCAL # 1 PCC PENSION FUND.....$ 3.50

SUPPLEMENTAL ANNUITY FUND....$ 2.00

INTERNATIONAL MASONRY INSTITUTE.....$ .25

BAC LOCAL # 1 BAC PAC................$ .01

INTERNATIONAL BAC PAC............$ .01

LABOR MANAGEMENT RELATIONS COMMITTEE.....$ .05

TOTAL FRINGE BENEFITS............$ 12.85

TOTAL PACKAGE.........................$ 37.70

### RESIDENTIAL MECHANIC 2'S

A. Effective for 1 year from July 1, 1997 through June 30, 1998. Continuation is subject to a joint review and a written agreement to extend by the BAC Local 1 and the BRCA.

B. (i) Residential Mechanic 2's Wage and Benefit Package



| | |
|---|---|
| HOURLY WAGES............................ | $ 15.35 |
| INTERNATIONAL DUES CHECK-OFF...$ | .22 |
| LOCAL DUES CHECK-OFF.............$ | .26 |
| LOCAL PAC BAC..........................$ | .01 |
| INTERNATIONAL BAC PAC..............$ | .01 |
| DEFENSE FUND...........................$ | .01 |
| TOTAL.....................................$ | 15.86 |

**MECHANIC2'S HOURLY FRINGES:**

| | |
|---|---|
| INTERNATIONAL DUES CHECK-OFF...$ | .22 |
| LOCAL DUES CHECK OFF...............$ | .26 |
| LOCAL BAC PAC.........................$ | .01 |
| INTERNATIONAL BAC PAC..............$ | .01 |
| DEFENSE FUND...........................$ | .05 |
| INTERNATIONAL PENSION FUND......$ | .25 |
| INSURANCE AND WELFARE FUND....$5.75 | |
| I.M.I........................................$ | .05 |
| LABOR RELATIONS MANAGEMENT COMM......................................$ | .05 |
| TOTAL.....................................$ | 6.65 |

(ii) 1 Job Steward and one Foreman Mechanic on each job to be paid at the regular Mechanic rate of pay and benefits.

(iii) 1 to 1 on scaffolds for apprentices

C. Outerboroughs - New position plus a job steward (at Mechanic's rate of pay and benefits) on each job.

D. Excluded from definition of residential: Prevailing rate work, nursing homes, hospitals, senior citizen homes, hotels, landmarks.

E. Employers must give written notice to BAC Local 1 of the location of the residential jobs prior to the start of the jobs.

Section 13. The Union, in its sole and absolute discretion, reserves the right to allocate and/or re-allocate the wage and fringe benefit package between wages and fringes but cannot reduce the Pension Fund contribution below $3.30 per hour without the Employers' consent.

Section 14. The Journeyman Mechanics in the bargaining unit shall receive the following wage increases: $2.00 effective July 1, 1997, $2.00 effective July 1, 1998, and $2.00 effective July 1, 1999. The BAC Local 1 shall have the right to allocate the foregoing increases between wages and the contributions to the Fund.

BAC Local 1 and BRCA agree to set up a committee to target commercial sites such as



Columbia University to obtain bargaining unit work.

* Subject to allocation and/or reallocation by the Union in its sole and absolute discretion into wages and/or any existing Fringe Benefit Funds, except that a reduction in the Pension Fund contributions below $3.30 per hour shall require the Employers' consent.

## ARTICLE XXIV
## CHECK-OFF AND POLITICAL ACTION COMMITTEES

Section 1. (a) The Employer shall deduct from the wages of each Employee who has signed an Employee assignment authorizing the deduction of working dues check-offs, including Interna-tional Union Working dues Check-offs, conforming to federal law and transmit monthly to the Union (or to any agency designated by said Union for the collection of said money), the sum for each hour paid which the Union has specified, or specifies from time to time and so advises the Employer in writing, as the portion of each Employee's working dues check-offs to the Union, to its International Union, or to any other affiliate of the International Union, subject to working dues check-off. The sums transmitted shall be accompanied by a statement, in a form specified by the Union, reporting the name of each person whose working dues check-offs are being paid and the number of hours each Employee has been paid.

(b) It is mutually agreed that the Employee assignments authorizing the

-30-

deduction of working dues check-offs shall be in blanket form filed with the Union. The Union agrees to indemnify and hold harmless the Employer from any and all claims and/or actions arising out of such deductions provided that the working dues check-offs have been paid over to the Union.

## ARTICLE XXV
## FRINGE BENEFIT FUNDS

Section 1. Commencing on the effective date of this Agreement and continuing to June 30, 2000, each Employer shall make fringe benefit contributions on behalf of all Employees employed by said Employer covered by this Agreement, from the first day of employment to the Pointers, Cleaners and Caulkers' Welfare Fund, Pension Fund, Annuity Fund, Benefit Fund and Education Fund, all in an amount called for in Articles XIII and XVIII of this Agreement.

Section 2. All contributions to the aforementioned Funds shall be made weekly for the pay period immediately preceding, to be mailed on the same day wages are paid and for the same period. A simplified weekly report on a form prepared by the Trustees shall accompany each weekly payment.

Section 3. The Trustees shall institute as soon as practicable, a system of receipts wherein the Fund Office shall send to the Employer receipts which shall be put in each Employee's pay envelope, which shall indicate that said Employer had made fringe benefit contributions for the period indicated on said receipt.

-31-



Section 4. A monthly report on a form prepared by the Trustees shall be remitted by each Employer not later than the fifteenth (15th) day of the following month.

Section 5. The Employer hereby agrees to be bound by and to the Agreements and Declarations of Trust of said Funds, as though the Employer had actually signed the individual documents and further agrees to be bound by all actions taken by the Trustees of each of the Fringe Benefit Funds pursuant to said Agreements and Declarations of Trust, as amended, and their respective Plans, as amended, and by all By-Laws, rules and resolutions adopted to regulate each of the Fringe Benefit Funds.

Section 6. It is agreed that contributions to all of the above Funds shall be required on all hours worked, including overtime but excluding premium time. For the purpose of overtime and premium time the Benefit Fund and Dues Check-off is to be considered part of the hourly pay and shall be paid at that rate of pay.

Section 7. (a) The books and records of the Employer shall be made available at reasonable times for inspection and audit by, but not limited to, the accountant, outside independent auditors or other representatives of the Trustees of any of Fringe Benefit Funds. The Employer shall be required to disclose upon such audits all payrolls and payroll ledgers including office payrolls, yard and payroll ledgers including office payrolls, New Jersey payrolls, New York payrolls, W2 payrolls, computer payroll printouts, W-2 payrolls, quarterly federal payroll tax returns (Form 941), quarterly state payroll tax returns (Forms

-32-

WRS-2 and WRS-30), annual federal and state tax returns, cash disbursements journals, purchase journals, New York State employment records, insurance company reports, Employer remittance reports, payroll and supporting checks, ledgers, 1099 forms, evidence of unemployment insurance contributions, payroll tax deductions, disability insurance premiums, certification of workers compensation coverage, checks in support of any governmental filings or tax payments, remittance reports and any other documentation support thereof and any other documentation concerning payment of fringe benefit contributions for hours worked by Employees remitted to multiemployer fringe benefit funds other than Fringe Benefit Funds described herein, and any other items concerning payrolls. In addition, the aforementioned books and records of any affiliate, subsidiary, alter ego, joint venture or other related company of the Employer doing bargaining unit work within the Union jurisdiction, shall also be made available at all reasonable times for inspection and audits by, but not limited to, the accountants, outside independent auditors or other representatives of the Trustees of the Fringe Benefit Funds.

-33-

(b) The Employer shall retain, for a minimum period of six (6) years, payroll and related records necessary for the conduct of a proper audit in order that a designated representative of the Trustees may make periodic review to this confirm that contributions owed pursuant to this Agreement are paid in full. In the event, after the Trustees have made a reasonable request, the Employer fails to produce its books and records necessary for a proper audit, the Trustees, in their



sole discretion, may determine that the Employer's monthly hours subject to contributions for each month of the requested audit period are the highest number of Employee hours for any month during the twelve (12) preceding months audited, or during the last twelve (12) months for which reports were filed, whichever monthly number of hours is greater. Such determination by the Trustees shall constitute presumptive evidence of delinquency. Prior to making such determination, the Trustees shall mail a final seven (7) day written notice to the Employer advising him that such determination shall be made if the Employer does not schedule a prompt audit. Nothing herein shall mean that the Funds relinquish their right to commence legal proceedings to compel an examination of the Employer's books and records for audit.

(c) When auditors are sent to audit the books and records of the Employer and a definite appointment is scheduled and the auditor cannot start at the appointed time and date and must return, or when complete payroll records required herein are not furnished, then the Employer shall be penalized and pay the sum of two hundred and fifty dollars ($250.00) per auditor, to cover the expense of the auditor.

(d) It shall be a violation of this Agreement for any Employer to fail to furnish proper payroll records when requested for the purpose of completing an audit. The Union shall have the right to remove all its members from the offending Employer provided that three (3) days written notice of the intention to remove Employees from a job is given to the Employer by

-34-

the Union by certified mail. If such members who are removed remain on the jobsite during regular working hours, they shall be paid for lost time.

(e) The President, Vice President, Secretary-Treasurer, individual partner, Employee of the partnership, officer, stockholder, proprietor or Employee of the Employer, whether it be a corporation, company, joint venture or proprietorship or other type of entity, acknowledges that he or she is vested with the authority and control over the submission of reports and/or payment of contributions to Fringe Benefit Funds and acknowledges that he or she shall be personally and individually obligated to submit the required reports and/or pay the required contributions to Fringe Benefit Funds for all work performed by Employees.

(f) In the event the Employer does not make timely payment of contributions to Fringe Benefit Funds required herein, it is agreed that the Employer shall be liable for the following liquidated damages: An additional payment of five percent (5%) of the amount owing, and if the Employer is a corporation, interest at the per annum rate of ten percent (10%) of the amount owing or at the maximum legal rate, whichever is greater. If the Employer is not a corporation, interest shall be at the maximum legal rate. Furthermore, if an audit is required of the Employer's books and records and a deficiency in contributions is determined, which is not paid within seven (7) days after reasonable notice, the Employer agrees to pay as additional liquidated damages five percent (5%) of the amount owing. If thereafter, in the sole discretion of the Trustees,

-35-

the Employer's account is referred to legal counsel for collection, the Employer agrees to pay as additional liquidated damages five percent (5%) of the amount owing as attorney's fees. If litigation is instituted by the service of a summons and complaint, or participation in any insolvency proceeding of the Employer is required, the Employer agrees to pay as additional liquidation damages five hundred dollars ($500.00) to each of Fringe Benefit Funds, or five percent (5%) of amount owing, whichever amount shall be greater. The Employer acknowledges and understands that the above damages are cumulative and are required to protect the fiscal integrity of Fringe Benefit Funds. Where collection of payment is made pursuant to a judgment against the Employer, the Employer recognizes the Trustees' right to receive liquidated damages, interest, costs and attorneys fees provided for pursuant to the civil enforcement provisions of the Employee Retirement Income Security Act, as amended. The Employer shall be liable for any of the above listed liquidated damages, interests, costs or fees for which its subcontractor may be liable. Excluded from the aforementioned are arrears as shown in the monthly reconciliation reports which are twenty percent (20%) or less.

(g) Where payment is made or an audit is conducted pursuant to a judgment or court order, the Employer recognizes the right of the Trustees of Fringe Benefit Funds to have the court enter an order permanently enjoining the Employer and its agents, representatives, directors, officers, stockholders, successors and assigns, for the remaining term of this Agreement from failing, refusing or neglecting to submit the

-36-

required employer remittance reports and/or to pay the required contributions to Fringe Benefit Funds, and requiring the Employer to cooperate in an audit in accordance with the provisions of this Agreement. In consideration of this Agreement the Employer represents and warrants that it will not raise any defense, counterclaim or offset to the Trustee's application for this order.

(h) The Employer recognizes that when payment of contributions to Fringe Benefit Funds pursuant to this Agreement is made by check or other negotiable instrument which is returned uncollected, Fringe Benefit Funds incur additional cost and expense. The Employer hereby agrees that in the event any payment to Fringe Benefit Funds by check or other negotiable instrument results in the check or other negotiable instrument being returned without payment after being duly presented, the Employer shall be liable for additional damages in the amount of one hundred dollars ($100.00) to cover such additional costs, charges, expenses. Nothing herein is intended, nor shall it be interpreted, to mean that Fringe Benefit Funds or the Union waive any other liquidated damages required to be paid pursuant to this Agreement in the event Employer contributions to Fringe Benefit Funds are not timely paid in full.

(i) Upon three (3) days written notice to the Employer, the union may withdraw its members from any job to enforce payment of delinquent contributions to Fringe Benefit Funds. The Union may also withdraw its members to enforce the requirement of this Agreement that Union working dues check-offs be deducted from

-37-



the wages of Union members or to enforce payment over to the Union of working dues check-offs already deducted from the wages of Union members.

(l) If Employees are withdrawn from any job in order to collect contributions to any of Fringe Benefit Funds, or to enforce the requirements of the Agreement that working dues check-offs be deducted from the wages of Employees or to enforce payment over to the Union of working dues check-offs already deducted from the wages of Employees, the Employees who are affected by such stoppage of work shall be paid for lost time, provided that three (3) days notice of the intention to remove Employees from a job is given to the Employer by the Union by certified mail.

(k) Any Employer whose account with any of Fringe Benefit Funds is found, upon regular or special audit ordered by the Trustees of any Fringe Benefit Funds, to be substantially delinquent, said Employer may be charged the full cost of such audit and the Trustees of various Fringe Benefit Funds shall be empowered to charge interest on delinquent contributions at such rate as they in their discretion may determine.

(l) When wages due Employees are unpaid by any party to this Agreement, Employees shall not work on the jobsite until these wages are paid.

(m) The Union shall not permit Employees to work for any Employer or any

-38-

person who as an individual, partner, or employee of partnership, or as an officer, stockholder or employee of a corporation owes ¹ wages to Employees or monies payable to Fringe Benefit Funds or working dues check-offs payable to the Union as in this Agreement provided and who thereafter seeks to employ Employees directly or as a partner or employee of another partnership or as an officer, stockholder or as an employee of another corporation or as a joint-venturer.

Section 8.    Any reference in this Agreement or any rider thereto to arbitration of any dispute shall not be binding upon Fringe Benefit Funds unless Fringe Benefit Funds consent in writing to submit the dispute to arbitration.

Section 9. On a job locality outside the City of New York, if the rules of the Union in said locality require the Employer to make fringe benefit payments to Fringe Benefit Funds of the Union in said locality, then the Employer shall not be required to make payment for the same purposes (except for Pension and Welfare) into Fringe Benefit Funds. In the event the Employer has already made payment into Fringe Benefit Funds, then they will be refunded. However, if the amounts of such payments (except pension and welfare) into Fringe Benefit Funds of the Union in said locality are less than the amount provided for in this Agreement, the Employer shall pay the difference to the Fringe Benefit Funds hereunder and, at the same time, shall give the locality of the job, the name and address of the Union in said locality and the amount paid into Fringe Benefit Funds.

-39-

Section 10. Notwithstanding anything herein contained to the contrary in this Agreement, payments to the PCC Local No. 1 Pension Fund and Welfare Fund are required to be made regardless of where Employees are employed, including any other jurisdiction where local Pension Fund and Welfare Fund agreements are enforced. In the event, however, that the Union shall make a reciprocal agreement with another Union regulating pension fund payments, the Employer shall make payments to Pension Fund and Welfare Fund of the Union only for the work done by its Employees.

Section 11. All Welfare and Pension contributions will be paid to the PCC Local No. 1 Welfare and Pension Funds in theirtheir entirely. All other contributions will be worked out in advance by the Employer and Employer. Both Employee and Employer shall report the hours worked out of town to Local No. 1.

Section 12. Full-time Employees of the Union and of Fringe Benefit Funds may, in the sole discretion of the Trustees of Fringe Benefit Funds, be eligible to be covered for benefits under each of Fringe Benefit Funds.

Section 13. Fringe Benefit Funds provided for in this Agreement shall be jointly administered by Trustees as designated under the provisions of the existing Agreements and Declarations of Trust, as amended, with an equal number being appointed by the Employers and the Union. Each of Fringe Benefit Funds shall bear its own cost of administration.

Section 14. As a pre-condition to becoming a signatory to the Local No. 1 Collective Bargaining Agreement, an Employee must meet the following requirements:

A. Have a bond or cash equivalent in the appropriate amount.

B. All outstanding interest and penalties on late payments must be paid.

C. All outstanding audit deficiencies must be paid.

D. All contributions due and owing must be paid.

Section 15. All amendments necessary to effectuate the foregoing shall be made in the trust documents.

Section 16. A union business agent and/or the PCC Funds Investigator shall be entitled to a list of names and social security numbers of all employees performing bargaining unit work on any job site within twenty-four (24) hours of the request to the Employer.

## ARTICLE XVI
## INDUSTRY PROMOTION FUND

Section 1. Commencing on July 1, 1997, and continuing to June 30, 2000, each Employer shall make contributions on behalf of all Employees covered by this Agreement and employed by the Employer, from the first day of employment to the Building -Restoration Contractors Industry Promotion Fund amounts computed by multiplying the total number of hours worked times ten cents ($ .10) per hour. Reports shall accompany each remittance on forms as required by the



Trustees of the Industry Promotion Fund. Collection procedures shall be the same as set forth for the other Funds as more fully described in Article XV of this Agreement.

Section 2. The Industry Promotion Fund shall be used to promote and expand the good and welfare of the industry of pointing, cleaning, caulking, repairing, cutting, patching, waterproofing, reconstructing, renovating and restoring the exteriors and/ or interiors of buildings and masonry structures within the City of New York, and more specifically to make known the jurisdiction of the industry and to promote the programs of industry, education, training, administration of collective bargaining agreements, research and promotion of waterproofing products, stabilize and improve Employer-Union relations, promote, support and improve the training and employment opportunities of Employees, and to disseminate to general contractors, architects, engineers and owners, information about the kind, quality and merits of the work done by the Industry, to make public the terms and conditions of this Agreement in order to avoid grievances and jurisdictional disputes, and to provide expanded opportunities for the employment of journeyman waterproofers. No part of said Industry Promotion Fund, and no part of the contributions thereto, shall be used for anti-union activities.

Section 3. The Industry Promotion Fund shall be administered by Trustees appointed solely by the Association.

Section 4. The Industry Promotion Fund shall reimburse Fringe Benefit Funds for all expenses

-42-

incurred in the collection and distribution of contributions, which amount shall be deducted before monies are paid over to the Industry Promotion Fund.

## ARTICLE XVII
## BONDING

Section 1. Each Employer covered by this Agreement shall provide throughout the term of this Agreement, a surety bond issued by a surety company in the State of New York to guarantee payment to the respective Fringe Benefit Funds of all required fringe benefit contributions. Each Employer shall furnish to the Trustees of the respective Fringe Benefit Funds a bond in an aggregate amount equal to one thousand dollars ($1,000.00) per Employee multiplied by the number of Employees employed. The minimum surety bond to be furnished by contractors to the Trustees of the Fringe Benefit Funds shall be four thousand dollars ($4,000.00). In lieu of a bond or as a supplement to a bond, an Employer may, at the sole discretion and upon the sole consent of the Trustees of the respective Fringe Benefit Funds, furnish cash and/or collateral alternatives in satisfaction of this bonding requirement.

Section 2. No Employee may work on any job unless the Employer shall have furnished such a bond. When an Employer bound by this Agreement owes to Fringe Benefit Funds an amount greater than the face amount of the surety bond furnished, the surety bond shall be increased to cover such indebtedness. If this is not done, the Union shall, after giving three (3) days notice, remove all Employees of the bargaining unit from

-43-

the employ of that Employer.

Section 3. The Trustees of Fringe Benefit Funds shall have the right to request any Employer to increase the amount of its surety bond whenever they deem it necessary for the protection of Fringe Benefit Funds.

Section 4. Each joint-venturer shall furnish a new surety bond covering each joint-venturer and the joint-venture, or shall furnish a rider from each of their respective insurance carriers, confirming that their respective surety bond protects the Fringe Benefit Funds during the period of the joint venture.

## ARTICLE XVIII
## APPRENTICES

Section 1. There shall be established a (4) year apprentice program as follows: An Employee may be hired for a trial period not to exceed one (1) month to ascertain if he is capable of working in the Industry. The rate of wages for such Employee shall be as hereafter provided. In the event the Employer determines such Employee is capable of working in the industry, within the trial period, the Employee must enroll through the Union as an apprentice. If the trial period shall expire without a determination by the Employer or the Employee is determined to be not capable of working in the Industry, then upon either of such events the Employee shall be discharged forthwith. During such trial period said Employee may not work on a scaffold, except as provided below.

Section 2. An Apprentice may do the work

-44-

of a Journeyman but may work on a scaffold only with a Journeyman. There shall be one (1) apprentice and one (1) mechanic working on a swing stage scaffold. A Journeyman is defined as a member of the Union designated by the Union as qualified to carry a Journeyman Union Book with the member's picture sealed in it.

Section 3. An Apprentice shall carry a Union book signifying his status as an Apprentice.

Section 4. After an Employee has successfully completed the Apprentice program, he shall be eligible to become a Journeyman as determined by the Union.

Section 5. An Employer may employ Apprentices provided that there is maintained a ratio of two (2) Apprentices to five (5) Journeyman working in a pipe scaffold or on the ground. An Employer who employs less than five (5) Local 1 Journeymen on a regular basis may employ two (2) Apprentices, subject to the approval of the Joint Apprenticeship and Training Committee.

Section 6. Apprentices shall be paid and fringe benefit contributions made on their behalf in accordance with the following wage and fringe benefit contribution schedule:

| Apprentice Years | Wages per hour | Dues Check-off (included in wages) | Pension Fund | Welfare Fund |
|---|---|---|---|---|
| 1st Year | 11.20 | .30 (.1 Int'l; .1 Local 1) | | 2.50 |

-45-



tion and other required federal and state insurance, etc.

Section 3. Each Employer shall keep accurate and detailed records for the purpose of insurance audit by the insurer, showing each Employee's hours of employment and classification thereof. Further, each Employer shall conform to all federal and state laws, codes, rules, regulations, etc., pertaining to insurance, health and safety of Employees.

| | | | | |
|---|---|---|---|---|
| 2nd Year | 14.86 (.148 Int'l; .21 Local 1) | .39 | .25 | 2.50 |
| 3rd Year | 18.00 (.23 Int'l; .27 Local 1) | .50 | .50 | 4.00 |
| 4th Year | 20.88 (.28 Int'l; .34 Local 1) | .62 | .75 | 5.75 |

Section 7. The criteria for completion of a year is to be determined by the Joint Apprentice Committee.

## ARTICLE XIX
## INSURANCE

Section 1. Each Employer shall carry workers' compensation, disability, liability and other insurance on its Employees required under state and/or federal laws. Each Employer shall furnish the Union with a certificate of insurance as proof of such insurance coverage. The Union shall be the holder of the certificate of insurance for purposes of notification and shall be notified by the insurance carrier of any and all charges in coverage and/or cancellation.

Section 2. No Employee shall be permitted to work for an Employer who does not carry workers' compensation, disability, liability and other insurance, nor shall any Employee be permitted to become a partner, officer, joint or co-venturer, independent contractor, and so forth, on a single job in order to circumvent the carrying of such insurance. Upon demand by the Union the Employer shall furnish evidence that he is complying with the laws on workers' compensa-

## ARTICLE XX
## OTHER CONTRACTS

Section 1. No Employee shall work for any Employer which is not a signatory to an Agreement with the Union and does not comply with the terms and conditions of employment in said Agreement.

Section 2. If an Employer covered by this Agreement or any such owner or principal forms or acquires by purchase, merger or otherwise, an interest, whether by ownership, stock, equitable or managerial, in another company, corporation, partnership or joint venture, performing bargaining unit work within this jurisdiction, this Agreement shall cover such other operation and such other bargaining unit Employees shall be considered an accretion to the bargaining unit.

Section 3. In order to protect and preserve, for the Employees covered by this Agreement, all work heretofore performed by them, and in order to prevent any device or subterfuge to avoid the protection and preservation of such work, it is hereby agreed as follows: If and when the

Employer shall perform any bargaining unit work of the type covered by this Agreement and within the geographical jurisdiction of the Union, under its own name or under the name of another, as a corporation, company, partnership or any other business entity, including joint venture, wherein the Employer exercises either directly or indirectly any significant degree of ownership, management or control and the two (2) enterprises have substantially identical management, business upose, operation, equipment, customers, supervision and/or ownership, the terms and conditions of this Agreement shall be applicable to all such work.

Section 4.    (a) No Employer shall enter into a contract with any other person, partnership, firm, corporation or joint venture employing Employees to perform bargaining unit work on the same job-site, unless such other person, partnership, firm, corporation or joint venture has signed an agreement with the Union or is a member of an employer association which has signed an agreement with the union.

(b) The Employer must not subcontract bargaining unit work unless the subcontractor receiving the subcontract has an agreement with the Union. In the event the subcontractor is delinquent in the payment of contributions to Fringe Benefit Funds then Fringe Benefit Funds shall give written notice thereof to the Employer, who shall then be required to withhold any sums due to the subcontractor. In addition, the Employer agrees to pay such delinquency directly to Fringe Benefit Funds to the extent that such withheld sums are satisfac-

-48-

tory. The Employer shall contact Fringe Benefit Funds weekly to ascertain whether the subcontractor has contributed all required monies to the Funds before the Employer makes further or final payment to the subcontractor.

(c) (i) The Employer and the Union hereby agree to the elimination of lumping (the subcontracting of labor without material). The subcontractor must furnish both labor and material complete under one contract.

(ii) The Employer agrees that it will not subcontract any work covered by this Agreement to any of its Employees in order to circumvent the payments of wages, contributions to Fringe Benefit Funds and working conditions provided for in this Agreement.

(iii) Once an award is made by the Employer to a subcontractor, then this Employer shall not permit the subcontracting of the same award to another subcontractor.

(d) When the Employer subcontracts or sublets any work of any type or kind whatsoever coming within the jurisdiction of the Union, the Employer shall be responsible for the subcontractor complying with all provisions of this Agreement. After due notification, any Employer who subcontracts or sublets any work of any type or kind whatsoever coming within the jurisdiction of the Union shall be responsible for the payment of wages, contributions to Fringe Benefit Funds and working dues check-offs by such subcontractor.

-49-



(e) The Employer shall not directly or indirectly sublet solely the labor services required for any contract to another contractor. The Employer shall not sublet or accept a contract or subcontract for work covered by this Agreement unless such contract or subcontract embraces all work covered by this Agreement.

(f) The Employer accepting a contract or sub-contract solely for the work as described in this Agreement, must perform all such work with his own Employees and such contract or subcontract shall not be sublet. However, an Employer having work covered by this Agreement may sublet such covered work to a contractor or subcontractor who is a signatory to an agreement with the Union. Notice of the subletting of the covered work on any project shall be given to the Union before any Employees are employed on such project. Such notice shall give the location of the project, name and address of the Owner, Contractor and Subcontractor.

(g) The Employer shall not have the right to enter into any contract involving subletting except as herein provided.

(h) All of the terms, covenants and conditions of this Agreement, and without limitation, the specific provisions of this section, shall be applicable for the duration, and during the entire term of this Agreement, regardless of any change in the status of the Employer, as for example, the Employer joining, during the term of this Agreement, any Association with whom the Union has an Agreement.

-50-

(i) The Employer agrees that this Agreement will run to and for the benefit of any other corporation or company which may now or hereafter exist or be formed or in which Employer may have any interest, if such subsidiary is engaged in any work covered by this Agreement.

Section 5. In order to protect and preserve, for the Employees covered by this Agreement, all work heretofore performed by them, and in order to prevent any device or subterfuge to avoid the protection and preservation of such work, it is hereby agreed as follows: If and when the Employer shall perform any on-site construction work of the type covered by this Agreement and within the geographical jurisdiction of the Union under its own name or under the name of another, as a corporation, company, partnership, or any other business entity, including a joint venture, and where there exists between the Employer and such other business entity interrelation of operations, common management, centralized control of labor relations and/or common ownership, the terms and conditions of this Agreement shall be applicable to all such work. In determining the existence of the aforementioned criteria, the presence of the requisite control or commonality only at the top level of management shall be deemed to satisfy those criteria.

Section 6. Should the Employer establish or maintain such other entity within the meaning of Article XX, Sections 3 and 5, the Employer is under an affirmative obligation to notify the Union of the existence and nature of and work performed by such entity and the nature and

-51-

extent of its relationship to the Employer. The supplying of false, misleading, or incomplete information (in response to a request by the Union) shall not constitute compliance with this Section.

## ARTICLE XXI
## ARBITRATION

Section 1. All complaints, disputes or grievances between the parties hereto involving solely questions of interpretation or application of any clause of this Agreement shall be resolved as follows:

(a) The Employer or his representative shall first meet with the representative of the Union, and attempt to adjust the grievance on a job-level basis as promptly as possible, but in no event later than three (3) days after the grievance arose.

(b) If the parties cannot resolve the grievance within the three (3) day period, then the matter shall within seven (7) days be referred to a Joint Adjustment Board consisting of two (2) representatives appointed by the Employer and two (2) representatives appointed by the Union. The decision of the Joint Adjustment Board shall be final and binding.

(c) If the Joint Adjustment Board is unable to resolve the grievance within ten (10) working days after the final meeting of the Joint Adjustment Board, then the Joint Adjustment Board shall endeavor to agree upon an impartial arbitrator to whom the grievance shall be

submitted in writing, by either party.

(d) If an agreement is not reached by the Joint Adjustment Board as to the selection of an impartial arbitrator, then the grievance shall be submitted in writing by either party to the American Arbitration Association for hearing and decision before an impartial Arbitrator selected from the Labor Panel of the American Arbitration Association. The decision of the Impartial Arbitrator shall be final and binding upon the parties. Costs shall be borne equally by the parties.

Section 2. The Employer will be required to keep records from the date of this Agreement and for the entire duration thereof, of all payrolls, cancelled checks, and other books and records where material and relevant to such dispute, complaint or grievance when requested by the Union.

Section 3. The Union and the Employer expressly agree that no demands for changes in this Agreement shall be made the subject of a dispute or arbitration.

Section 4. The Joint Adjustment Board shall be permitted fashion remedies which assist in the enforcement of the Collective Bargaining Agreement, including but not limited to the appointment of a union monitor to be paid by the Employer.



## ARTICLE XXII
## TRADE AND JURISDICTIONAL DISPUTES

The Employer agrees to recognize the jurisdictional claims of the International Union that have been established in its constitutions, by agreements with other crafts, or as the result of decisions under the National Plan for the Settlement of Jurisdictional Disputes in the construction industry as well as all work performed by the Union according to past and prevailing practices; and further agrees to assign all such work to members of the Union before commencing work, subject to existing practices and agreements future jurisdictional decisions.

## ARTICLE XXIII
## NO STRIKES AND NO LOCKOUTS

Section 1. The Union shall not order a strike or stoppage of work against the Employer, the Employees shall not strike against the Employer, the Employees shall not leave the work of the Employer, and the Employer shall not lock out Employees prior to filing a complaint, dispute or grievance, or pending the resolution thereof, as provided in Article XXI hereof.

Section 2. The Union may call or sanction a strike for the Employer's refusal to submit a matter to arbitration, pursuant to Article XXI of this Agreement, for the Employer's failure to comply with any decision thereof within five (5) working days after such decision, and for any other reason explicitly provided for in this Agreement.

-54-

Section 3. When the Union, upon investigation, finds that the Employees on any job are being paid less than the rate of wages prescribed in this Agreement, they shall, provided that three (3) days notice of the intention to remove Employees from a job is given to the Employer by the Union by certified mail, be entitled to withdraw the Employees from such job without first submitting the complaint to arbitration. Thereafter, the Union shall consider the complaint as provided for in Article XXI of this Agreement. No damages of any kind or nature shall be awarded or allowed against the Union, its constituent Local Unions, or any officer or member thereof by reason of the withdrawal of members of the Union from a job for which a complaint has been filed as aforesaid.

Section 4. The foregoing does not deny the right of the Union to render assistance to other labor organizations by removing members from jobs, when combined action by all trades is officially ordered, but no removal shall take place until notice is first given to the Employer.

## ARTICLE XXIV
## CONTINUITY OF AGREEMENT

Section 1. The Employer, whether as an individual, partner or employee of a partnership, or as an officer, director, stockholder or employee of a corporation, agrees to remain bound by the terms and conditions of the Agreement, although doing business as an individual under another trade name, or as a partner or employee of another partnership, or as an officer, director, stockholder or employee of another corporation, or as a joint-venturer.

-55-

## ARTICLE LXXV
### VALIDITY

Section 1. It is further agreed by and between the parties that if any Federal or State Court shall at any time decide that any clause or clauses of this Agreement is, or are void or illegal, such decision shall not invalidate the other portions of this Agreement, but such clause or portions of this Agreement, but such clause or clauses shall be stricken out and the the remaining portions of this Agreement shall be considered binding between the parties hereto. Nothing contained in this Agreement shall be construed to prevent any one or more individual Employees from pursuing what ever civil or criminal remedies they may have under the law for the collection of their wages, or any part thereof.

Section 2. Any provisions of this Agreement hereinabove mentioned which provide for Union security or employment in a manner and to an extent prohibited by any law or the determination of any Governmental Board or Agency, shall be and hereby are of no force or effect during the term of any such prohibition. It is understood and agreed, however, that if any of the provisions of this Agreement which are hereby declared to be of no force or effect because of restrictions imposed by law is or are determined either by Act of Congress or other legislative enactment or by a decision of the Court of highest recourse to be legal or permissible, then any such provision of this Agreement shall immediately become and remain effective during the remainder of the term of this Agreement. The Union reserves the right to renegotiate any of the provisions of the Agreement which may be of no force or effect, or

to declare this entire Agreement null and void and of no further force or effect whatsoever.

## ARTICLE LXXVI
### MISCELLANEOUS

Section 1. The Employer and the Union mutually agree that each will comply and cooperate with all federal, state and/or local laws, codes, rules, ordinances, regulations, executive orders and administrative decisions dealing with non-discrimination in training, employment, job tenure, promotions and every other matter covered by such laws, codes, etc., not herein expressly mentioned. The Employer and Union shall not discriminate against any Employee or applicant for employment because of race, creed, color, gender, national origin, or age.

Section 2. There shall be no discrimination on the part of the Employer against any Employee for any reason or any activities iheon behalf eof, or representation of, the Union, that do not interfere with the proper performance of his duties as an Employee.

Section 3. Employees covered by this Agreement shall work only for a recognized and qualified Employer. The Employer shall carry reliable and adequate workers' compensation, disability and liability insurance on its Employees. The Employer shall furnish the Union with satisfactory proof of such insurance coverage upon reasonable request. Further, the Employer shall conform to all federal and state laws, codes, rules, regulations, etc. pertaining to insurance, health and safety of Employees.

-56-

-57-



**Section 4.** All Employees, at the termination of their employment, shall receive from the Employer the New York State Record of Employment Form 1A within twenty-four (24) hours of their dismissal.

**Section 5.** The caption and section headings contained herein are for the purpose of convenience only and in no manner shall limit or be used to define or interpret this Agreement.

**Section 6.** Employees not qualified by the Union as Journeymen shall be able to participate, if they so desire, in the Educational Programs provided by the Union.

**Section 7.** No Apprentice shall work on a Swing Scaffold or assist or be assisted in a boatswain's Chair by any Employee other than a Journeyman.

## ARTICLE XXVII
## DURATION

This Agreement is effective for the period commencing July 1, 1997 and shall terminate on June 30, 2000.

## ARTICLE XXVIII
## RETROACTIVITY

It is mutually agreed that all wages, contributions to Fringe Benefit Funds and conditions provided for in this Agreement shall be retroactive to July 1, 1997.

## ARTICLE XXIX
## RENEWAL

**Section 1.** This Agreement shall be deemed to be, and shall be automatically extended and renewed from year to year by and between the parties hereto for one (1) year terms upon all of the above terms, conditions and covenants, unless either party gives written notice to the other not less than sixty (60) calendar days prior to the then expiration date of this Agreement of its desire to amend, change or terminate this Agreement on its expiration date. In the event such notice is given, the parties shall begin negotiations within forty-five (45) calendar days. If negotiations are not completed prior to the expiration date, this Agreement shall terminate unless extended by mutual agreement of the parties.

**Section 2.** All notices, requests, demands and other communications which are required to be or may be given under this Agreement shall be in



writing and shall be deemed to have been duly given when delivered in person or three (3) days after dispatch by certified mail, postage prepaid, return receipt requested, to the party to whom the same is so given or made, at the addresses set forth below, or at such other address as any party may specify by notice to all other parties, given as aforesaid.

If to the Union addressed to:
Local 1, New York
International Union of
Bricklayers and Allied Craftsmen
4 Court Square
Long Island City, New York 11101

If to the Employer, at the address set forth in this Agreement.

## ARTICLE XXX
## COMPLETE AGREEMENT

Section 1. There are no representations, agreements, arrangements or understandings, oral or written, between the parties relating to the subject matter of this Agreement which are not fully expressed in this Agreement.

Section 2. This Agreement supersedes all prior agreements and understandings between the parties and constitutes the entire agreement of the parties with respect to the subject matter hereof.

Section 3. No provision of this Agreement shall be modified, amended or terminated except by a writing specifically referring to this Agreement and signed by all parties hereto.

Section 4. This Agreement constitutes the entire agreement between the parties and concludes all collective bargaining negotiations for the full term hereof and any automatic extensions and renewals thereof. It is agreed that all matters desired by any of the parties have been presented, discussed and incorporated herein or rejected. Accordingly, except to the extent expressly stated in the contrary in Article XXX, Section 3, hereof, it is agreed that for the term of this Agreement, each party hereto voluntarily, unqualifiedly and irrevocably waives the right, and each agrees that the other shall not be obligated to bargain collectively with respect to any subject or matter, whether or not referred to in this Agreement.

Section 5. In the event the Union enters into any agreement with another Employer containing more favorable terms and/or conditions than those contained herein, the Union agrees that such more favorable terms and conditions shall automatically be extended to the Employer covered by this Agreement.

## ARTICLE XXXI
## BENEFIT

This Agreement shall be binding upon and shall inure to the benefit of each party hereto, its successors and assigns, and any successor thereto resulting from a merger, consolidation or other reorganization or restructuring regardless of changes of name, style or address of the Employer.

## ARTICLE XXXII
### EFFECTUATING CLAUSE

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed the day and year above written by their duly authorized officers, and represent to each other that they were duly authorized to enter into this Agreement. The Company hereby acknowledges receipt of copies of the Agreements and Declarations of Trust of Fringe Benefit Funds,

## ARTICLE XXXIII
### SIGNATURE

The individual signing on behalf of the Employer hereby affixes his signature in a dual capacity both on behalf of himself and on behalf of the Employer and represents by his signature his

authority to bind himself, the Employer and the principals and members thereof. The person signing on behalf of the Employer also agrees to be personally bound by and to assume all obligations of the Employer provided for in the Agreement.

Employer_____

Name & Title (Print)_____

Signature_____

Corporate Address_____

Telephone No._____

Fed. I.D.#_____

Individual Address_____

Telephone No._____

S.S.#_____

Union:
Local 1, New York,
International Union of
Bricklayers and Allied Craftsmen

By:_____
An Authorized Officer

Santo Lanzafamo - President
Jeremiah Sullivan - Secretary/Treasurer



✓ (66) NY 0068

# MEMORANDUM OF AGREEMENT

**AGREEMENT** entered into between **LOCAL 1, NEW YORK, INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTSMEN ("BAC LOCAL 1")** and the **BUILDING RESTORATION CONTRACTORS ASSOCIATION, INC.** and individual Employers (the "Employer").

The provisions of the Agreement between BAC LOCAL 1 and the BUILDING RESTORATION CONTRACTORS ASSOCIATION, INC. ("BRCA"), the Employer effective July 1, 1997 through June 30, 2000 are extended and made applicable to the parties hereto, except as modified by this Memorandum.

1. <u>Term</u> - Four (4) year Agreement effective on and after July 1, 2000 through June 30, 2004.

2. <u>Job Reporting</u> - Add to Article XI, Section 11, as follows:

> The Employer shall also advise the Union of any new job prior to the men being sent to said job. Any job not so reported shall result in a fine of $250.00/day for each day not reported.

3. <u>Residential Mechanics</u> - Provide that Residential Mechanics may only be utilized on apartment houses, condominiums and coops. Any of the aforementioned that have commercial space on the ground floor and/or mezzanine shall still be considered residential.

4. <u>Make-Up Day</u> - Add to Article XII, Section 4, as follows:

> a. Loss of work due to a holiday shall not qualify for a make-up day.

> b. Only employees working on the job site for which the make-up day is utilized may work the make-up day. Employees may not be brought in from other job sites.

> c. Provide that if employees attend Union sponsored rallies, then any time lost would be eligible for a make-up day.

5. <u>Bonds</u> - Increase minimum bond amount to $20,000.00.

6. <u>Industry Cooperation</u> - Provide that the Union will respond to the Association, in writing, to each notification sent to it, in writing, by an Employer regarding non-union work or violations of the Collective Bargaining Agreement. Said response shall indicate what action was taken by the Union.

7. <u>Foremen</u> - Amend Article XI, Section 1 (a) to increase the foreman's rate from $1.25 to $2.50, and amend Section 1 (b) to increase the foreman's rate from $2.00 to $4.00.

8. <u>Apprentices</u> - Provide that Apprentices shall advance when they reach 1,000 hours or one (1) year of service, whichever comes later. A competency test shall also be required for advancement.

9. <u>Funds</u> - Provide that the Trustees of the Funds shall establish a receipt system for weekly contributions to the Funds. Further, provide that (a) the Fund Office shall notify a delinquent Employer that it has two (2) weeks to cure said delinquency. If said delinquency is not cured within the two (2) week period, then the Union will notify said Employer that it has three (3) days to cure the delinquency or its manpower will be removed. If not cured within three (3) days, then the Union will withdraw the manpower; and (b) provide that an employee who does not immediately report to the Union and/or Fund Office that he did not receive a receipt with his weekly paycheck, will not be eligible for welfare coverage during the period of time that the Union and/or the Fund Office is not notified.

10. <u>Residential Mechanics</u> - The utilization of Residential Mechanics shall automatically end at the termination of this Agreement, unless there is an agreement by the parties to continue this program.

11. <u>Wage Package</u> - (a) Regular Mechanics and Residential Mechanics in the bargaining unit shall receive the following increases:

|  | Increase Per Hour |
|---|---|
| 7/1/00 | 2.00 |
| 7/1/01 | 2.00 |
| 7/1/02 | 2.00 |
| 7/1/03 | 2.00 |

(b) Apprentices shall receive the following increases:

|  | First Year | Second Year | Third Year | Fourth Year |
|---|---|---|---|---|
| 7/1/00 | 2.00 | 2.00 | 2.25 | 1.70 |
| 7/1/01 | .60 | 1.20 | 1.50 | 1.70 |
| 7/1/02 | .60 | 1.20 | 1.50 | 1.70 |
| 7/1/03 | .60 | 1.20 | 1.50 | 1.70 |

(c)The Union shall have the right to allocate the foregoing increases between wages and contributions to the Funds.

   12.  **Signature** - The individual signing on behalf of the Employer hereby affixes his signature in a dual capacity both on behalf of himself and on behalf of the Employer and represents by his signature his authority to bind himself, the Employer and the principals and members thereof. The person signing on behalf of the Employer also agrees to be personally bound by and to assume all obligations of the Employer provided for in the Agreement.


   IN WITNESS WHEREOF, the parties have signed this Agreement on the 28th day of June, 2000.


LOCAL 1, NEW YORK INTERNATIONAL          BUILDING RESTORATION
UNION OF BRICKLAYERS AND ALLIED          CONTRACTORS ASSOCIATION, INC.
CRAFTSMEN


By: _____                 _____
    Santo Lanzafame, President            Lon Best, President
                                          16 Court Street, Brooklyn, NY 11241
                                          (718) 624-2200

By: _____
    Jeremiah Sullivan, Secretary
                    Treasurer


By: _____
    Sean McGlone